# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1860-21

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

ROBERT J. FERRY, a/k/a
ROBERT D. FERRY,
ROBERT DEGIACOMO,
ROBERT DIGIACOMO, and
ROBBERT FERRY,

    Defendant-Appellant.

_____

Argued September 18, 2023 – Decided February 2, 2024

Before Judges Gooden Brown and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 19-08-1739.

Austin J. Howard, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Austin J. Howard, of counsel and on the briefs).

Sarah D. Brigham, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney

General, attorney; Sarah D. Brigham, of counsel and on the brief).

PER CURIAM

After losing his motion to suppress evidence seized from his person without a warrant, defendant Robert Ferry was tried by a jury and convicted of first-degree endangering the welfare of a child (EWC) by storing or maintaining 1,000 or more items of child sexual exploitation using a file sharing program, N.J.S.A. 2C:24-4(b)(5)(a)(iii) (the distribution charge), and second-degree EWC by possessing between 1,000 and 99,999 items depicting child sexual exploitation, N.J.S.A. 2C:24-4(b)(5)(b)(ii) (the possession charge) as charged in a two-count Atlantic County indictment. In addition to the imposition of various monetary fines and penalties, including a Sex Crime Victim Treatment Fund (SCVTF) penalty, N.J.S.A. 2C:14-10(a), defendant was sentenced to an aggregate term of fifteen years' imprisonment, with a ten-year period of parole ineligibility, to be served at the Adult Diagnostic and Treatment Center at Avenel,[1] a special sentence of parole supervision for life, N.J.S.A. 2C:43-6.4, and requirements and restrictions under Megan's Law, N.J.S.A. 2C:7-1 to -23.

---

[1] Under Chapter 47, N.J.S.A. 2C:47-1 to -10, a defendant can be sentenced to the Adult Diagnostic and Treatment Center at Avenel if the judge is persuaded by a preponderance of the evidence that the defendant's conduct was

The convictions stemmed from a year-long undercover investigation that revealed defendant stored or maintained over 1,000 photo images and videos depicting sexual exploitation and abuse of children using a file-sharing program. The images included pubescent girls posing naked or engaging in prohibited sex acts. The investigation identified defendant's internet protocol (IP) address at his apartment as the source of the file sharing. When law enforcement officers executed a search warrant on defendant's apartment, they found another individual inside but ruled him out as a suspect. Shortly thereafter, officers found defendant on the street heading back to his apartment and seized two phones from his person without a warrant. After obtaining a search warrant for the phones, additional evidence consistent with child pornography was found on them.

On appeal, defendant raises the following points for our consideration:

POINT I

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS TWO CELL PHONES SEIZED BY POLICE WITHOUT A WARRANT OR ANY EXIGENCY.

A. The Search Warrant for Defendant's Residence Did Not Authorize Police to

characterized by a pattern of repetitive, compulsive behavior. See State v. Howard, 110 N.J. 113, 126-31 (1988).

A-1860-21

Seize the Cell Phones from His Person Outside His Residence.

B.      No Exigency Justified the Warrantless Seizure of Defendant's Cell Phones Because Police Seized the Phones Before Defendant Allegedly Attempted to Delete Any Data.

POINT II

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL BECAUSE THE STATE RELIED ENTIRELY ON SPECULATION TO PROVE THAT DEFENDANT WAS THE PERSON WHO DISTRIBUTED THE FILES.

POINT III

THE PROSECUTOR'S OPENING AND CLOSING REMARKS DENIED DEFENDANT A FAIR TRIAL BECAUSE THEY URGED THE JURY TO CONVICT HIM OF DISTRIBUTION BASED SOLELY ON AN IMPROPER PROPENSITY ARGUMENT AND THE HEINOUSNESS OF THE ALLEGATIONS.

POINT IV

THE TRIAL COURT DENIED DEFENDANT A FAIR TRIAL BY FAILING TO SUA SPONTE INSTRUCT THE JURY ON THIRD-PARTY GUILT DESPITE EVIDENCE THAT A THIRD PARTY COULD HAVE DISTRIBUTED THE FILES.

POINT V

THE CUMULATIVE EFFECT OF THE INSTRUCTIONAL AND PROSECUTORIAL ERRORS DENIED DEFENDANT A FAIR TRIAL BECAUSE, TOGETHER, THEY LED THE JURY TO IGNORE EVIDENCE OF THIRD-PARTY GUILT AND TO INSTEAD CONVICT DEFENDANT BASED ON HIS BAD CHARACTER.

POINT VI

DEFENDANT'S SENTENCE IS EXCESSIVE, AND THE COURT COMMITTED NUMEROUS ERRORS THAT REQUIRE A REMAND FOR RESENTENCING.

A. The Court Should Have Found Mitigating Factor Four Based on Defendant's Troubled Upbringing and Mental Health Issues.

B. The Court Improperly Considered Dismissed Charges in Assessing Defendant's Prior Criminal History.

C. The Court Wrongly Considered the Present Offense in Finding Aggravating Factor Six, Which Should Have Been Limited to Defendant's Prior Criminal Record.

D. The Court failed to Conduct a Mandatory Assessment of Defendant's Ability to Pay the Penalty for the Sex Crime Victim Treatment Fund (SCVTF).

E. Defendant's Judgment of Conviction Must

5

Be Amended on Count One to Reflect that
He Was Convicted of N.J.S.A. 2C:24-
4(b)(5)(a)(iii).

We have considered the arguments in light of the record and applicable legal principles. Based on our review, we affirm the convictions and sentence but remand to the trial court for the limited purpose of reconsidering the SCVTF penalty assessment in accordance with State v. Bolvito, 217 N.J. 221 (2014), and correcting the judgment of conviction (JOC) to accurately reflect defendant's conviction on the distribution charge.

I.

We glean these facts from the two-day trial conducted on September 22 and 23, 2021, during which the State produced four law enforcement witnesses.

Special Agent Joseph Hiles of the United States Department of Homeland Security testified that in 2018, he began investigating individuals who were suspected of sharing digital files containing "child abuse images" on the internet. During the investigation, Hiles identified an IP address[2] offering to share such files with others by utilizing the peer-to-peer file-sharing network known as "BitTorrent." Hiles explained that "[a] peer-to-peer file sharing network [is] . . .

---

[2] An IP address is an identifying number assigned to an internet subscriber by the subscriber's service provider. State v. Reid, 194 N.J. 386, 389 (2008).

a collection of computers that . . . us[e] the internet to communicate with each other and share . . . pretty much any type of file," including "music files, videos, images, [and] books."  "[I]t enables users to distribute and download data and electronic matter[s] in a decentralized manner" on "a variety of different platforms and operating systems."

According to Hiles, to obtain a file using the "BitTorrent" network, after "download[ing] a BitTorrent client[3] or . . . piece of software" from the internet, a user typically uses a "torrent indexing [web]site" where the user can input a "search term" to receive "different torrents that may match that search."  The user can then "download that torrent from the website[ and] load it into [the user's] BitTorrent software," which can be installed on internet-capable devices such as "phones and computers."  When a user downloads an image or file using BitTorrent software, the user is automatically sharing that image or file to the BitTorrent network.

Hiles explained that when a torrent file containing child pornography is located by law enforcement, the torrent's "info hash" is entered into a federal database.  An "info hash" is "a mathematical algorithm" that produces "a unique . . . fingerprint for that file."  Hiles testified that using "a law-enforcement

---

[3]  BitTorrent client "refer[s] to BitTorrent programs," such as "Deluge."

modified version of the BitTorrent software," he was able to obtain "IP addresses . . . associated with . . . info hashes[] or torrents that contain child-exploitation material," and then "create a direct connection to that IP address" to "obtain copies of those torrents."

Specifically, on March 19, 2018, using the law-enforcement BitTorrent software, Hiles connected to an IP address associated with child pornography info hashes and downloaded six files from the suspect IP address. Hiles repeated this process on eleven more occasions between March 30, 2018, and December 16, 2018, downloading thousands of video and picture files depicting child pornography from the suspect IP address.[4] Hiles recounted that the file names consisted of various descriptions indicative of child exploitation, including 10PTHCcenter-((OPVA)2013(lowlyinskype_113anal.avi. According to Hiles, "PTHC" commonly "stands for pre-teen hard core."

Using the American Registry for Internet Numbers, Hiles determined that Comcast was the service provider for the suspect IP address. Comcast's account records revealed that the IP address was registered in defendant's name, with a

---

[4] Additional downloads occurred on March 30, April 1, April 13, April 14, May 13, May 23, July 16, July 17, September 11, December 15, and December 16, 2018.

A-1860-21

service address located on South Essex Avenue in Margate City, Apartment One. The account was also associated with an email address in defendant's name.

In January 2019, Hiles turned over his investigation to Detective Deborah Specht of the Atlantic County Prosecutor's Office (ACPO). Hiles provided Specht with two discs that contained copies of the files downloaded from defendant's IP address, as well as the IP address subscriber information from Comcast. Specht "reviewed all the files that were downloaded" and confirmed that "[t]here were numerous still images as well as videos which contained images of children [of] various ages involved in sex acts and/or depicted nude or partially nude."

Specht also contacted Comcast for "IP history, associated with [defendant's] account," and confirmed that "the [suspect] IP address was assigned" "consistently" to defendant's account during the entirety of the investigation. Through a public records search, Specht further confirmed that the service address associated with defendant's IP address was the same address defendant listed on his driver's license. In addition, on January 24, 2019, Specht visited defendant's address and determined using a "Fluke Network

9

AirCheck[]"[5] that "[e]very wireless network" in the area "was secured" and required a "specific [account] password" to "connect to th[e] wireless network."

In March 2019, Specht was contacted by Hiles and "advised that [he] had received additional downloads from the [suspect] IP address." Specht later received from Hiles "a disk . . . that had two additional events" from "two separate dates" containing "additional images" of child pornography downloaded from the suspect IP address. In total, over the course of the investigation from March 2018 to March 2019, over 1,000 items of child pornography were downloaded from defendant's IP address. The jury viewed a sampling of the items during the trial.

On April 17, 2019, Specht applied for and obtained a search warrant, authorizing law enforcement to search defendant's Margate apartment and seize evidence of the crime of EWC. At approximately 6:00 a.m. the following day, Specht, Hiles, and other law enforcement officers executed the search warrant. The sole occupant inside defendant's apartment at the time was an individual later identified as Frank Cruz. Cruz was removed and the apartment was searched for evidence pertaining to the investigation.

---

[5] Specht explained that a "Fluke" is "a device that will read wireless networks that are available in the area" to determine "whether or not they are open and accessible, or whether they[ are] secured."

Sergeant Stanley Yeats of the ACPO's High Tech Crimes Unit was a member of the search team. According to Yeats, although Cruz was found inside the apartment when the warrant was executed, only one person could have been living in the apartment because there was only "one" place to sleep. Yeats described "a padded bench, [or] a futon . . . without a back" in the "living[ ]room" that "appear[ed] to be . . . used as a bed." It had "a blanket on it" and "a pillow." As for the "bedroom," Yeats recalled that there was no bed or "anywhere to sleep in that room" and that the bedroom contained "several bags of clothes, a table, and . . . [a] refrigerator." Yeats further testified that "two gaming systems and an internal hard drive" were seized from defendant's apartment. However, "no evidence of [child pornography] images [were] recovered on . . . those devices." Yeats also authenticated photographs taken inside defendant's apartment which were admitted into evidence.

Approximately fifteen or twenty minutes after the search team arrived at the apartment, defendant was observed "walking down the street on Essex Avenue towards the apartment." ACPO Detective Christopher Hallett and Special Agent Teague[6] of the Department of Homeland Security approached defendant and "asked him if he would be willing to speak to [them]." During

---

[6] The spelling of Teague appears alternately in the record as Teague and Teig.

the encounter, Hallett seized two cell phones from defendant, "a ZTE cell phone," and "a Coolpad cell phone." Both phones were password protected.

After Specht secured a search warrant for defendant's cell phones, Hallett conducted "a data extraction" which uncovered "pictures, videos, [and] web history" from each cell phone. The cell phone extractions revealed 770 "items that were consistent with child pornography." Specifically, Hallett testified that there were "seven [playable] videos" on the ZTE cell phone, and "about 700 [pictures]" on the Coolpad cell phone.

Hallett also testified that each cell phone had "internet search[es]," "web history," and "web bookmarks" that were "consistent with child pornography." Many of the search terms found on defendant's cell phones were consistent with terms associated with the file names that were shared from defendant's IP address. These search terms included "LS Magazine," "LS Models," and "PTHC," which corresponded with files shared from defendant's IP address on July 16, 2018, and September 11, 2018. The web bookmark history included "jail bait paradise, youngest jail bait girls, . . . [and] jail bait girls forum."

Hallett further testified that each cell phone had BitTorrent software clients installed. The ZTE cell phone had "Unisform," "BitTorrent, torrent downloads," "Flud bit," "Bit Cloud," and "T Torrent Light" installed, and the

12

Coolpad cell phone had "BitTorrent, Torrent downloads" "Bit Cloud," and "Flud Torrent" installed. Although Specht had testified that "'the suspect device . . . was using BitTorrent client software Deluge,'" and Hiles had confirmed that "Deluge was one of the clients . . . being used" to file-share the child pornography from defendant's IP address, "Deluge was not installed on either phone." Both cell phones and their data extractions were entered into evidence at trial and examples of the images and search terms were shown to the jury.

Hallett returned to defendant's apartment on April 24, 2019, with Hiles and Yeats and placed defendant under arrest. No one other than defendant was at the apartment when the officers returned.

On September 23, 2021, the jury found defendant guilty of both charged offenses. On January 24, 2022, the judge sentenced defendant and memorialized the sentence in a February 18, 2022, JOC. This appeal followed.

## II.

In Point I, defendant argues the judge erred in denying his motion to suppress the cell phones. According to defendant, the seizure of "[his] two cell phones from his person outside his residence was not authorized by the search warrant . . . nor by the exigent-circumstances exception" to the warrant requirement.

13

At the suppression hearing conducted prior to trial, the State produced Hallett, a then seventeen-year veteran of the ACPO, who testified that in 2019, while assigned to the Computer Crimes Unit, he was a member of the search team tasked with executing a search warrant that authorized the search of defendant's apartment and "any person present in the residence at the time of the execution of the warrant and any electronic items (i.e.[,] iPhone, Android or other cellular device, iPod or other media storage device, etc.) they may have in their possession."  Based on the nature of the investigation, Hallett understood that the purpose of the search was to uncover "digital evidence" of child pornography.  The search warrant and Specht's supporting affidavit were submitted at the hearing and reviewed by the judge.

According to Hallett, when the search team arrived at defendant's apartment to execute the warrant at about 6:00 a.m. on April 18, 2019, Cruz was the only occupant in the apartment.  Cruz advised the officers that defendant was "out for a walk" and "should be home shortly."  Approximately "[fifteen] minutes" later, Hallett and Teague observed defendant walking "down Essex Avenue towards his apartment."

Hallett testified that when they approached defendant, he was approximately "[fifty] yards from the front door of his apartment."  They asked

14

defendant if he would be willing to "sit in [Hallett's] car" and "speak to [them]" about an [ongoing] investigation" and defendant agreed. Prior to defendant entering the vehicle, Hallett asked "if he had any weapons on him." In response, defendant reached into his pocket and pulled out two cell phones. Hallett took the phones and "put them on the back of [his] vehicle" before frisking defendant for weapons. Finding no weapons, all three men then entered the vehicle, which was located about "[thirty] yards from the front of the apartment."

Inside the vehicle, defendant sat in the "rear passenger[ seat,]" Teague sat in the rear directly to the left of defendant, and Hallett sat in the driver's seat. When Hallett entered the vehicle, he "brought [the cell phones] into the car" with him and placed "them in the passenger seat . . . next to [him]." Next, the officers had defendant sign a Miranda[7] form and then proceeded to question him about "the ongoing investigation." At some point, Hallett asked defendant about the passwords or passcodes for the phones. Initially, defendant claimed "he did[ not] remember the passcodes for the cell phones," but later stated he "remember[ed] the one for the ZT[E] cell phone."

Hallett then "handed [defendant] the cell phone so he could put in the passcode" and observed defendant "pressing the volume down and the power

_____

[7] Miranda v. Arizona, 384 U.S. 436 (1966).

15

button on the phone." Based on Hallett's "train[ing] in . . . extracting data from cell phones," he was aware that this was "a way to put the cell phone into download mode . . . to wipe the cell phone." Fearing that defendant was attempting to destroy evidence, Hallett immediately "took the phone back from [defendant]" and ended the interview. Although Hallett retained the phones, he testified defendant "was not under arrest the whole time" and "was allowed to go back to his apartment."

Hallett acknowledged that he was aware that "[defendant] was the target of th[e] investigation" and the resident of the apartment before he encountered him on the street. Hallett explained that based on his training and experience, he "took possession of [defendant's] cell phones" in the first place because he understood the objective of the search warrant was to secure "electronic devices" that may contain evidence of child pornography and he was "concerned about the data being wiped" from defendant's cell phones. After Hallett seized the phones, he turned them over to the evidence custodian. Once a search warrant was obtained for both phones, the ensuing data extractions revealed, among other things, images, videos, and internet searches consistent with child pornography.

Following oral argument, the judge denied defendant's suppression motion in a February 2, 2021, letter decision. In the opinion, the judge credited Hallett's testimony, finding him "truthful," "consistent," and "believabl[e]." Accordingly, the judge made factual findings consistent with his testimony. Applying the factual findings to the governing legal principles, the judge concluded that "[e]ven if the seizure of the cell phones from [d]efendant while outside of his actual residence was outside the scope of the warrant," the seizure was lawful under the "exigent circumstances" exception to the warrant requirement.

The judge explained:

> [O]nce it was established that [d]efendant was in fact the sole person who resided in the residence for twelve years,[8] there was probable cause to believe that the cell phones contained evidence of a crime and that destruction of evidence was so imminent that a warrant could not have first been obtained. The phones are capable of being connected to the IP address. Officers had reason to believe that . . . defendant was involved in sharing child pornography. . . . [D]efendant argued that . . . [he] was not at that point "under arrest." However, . . . defendant does not have to be under arrest for property to be lawfully seized. That is just another exception. Here, . . . defendant was suspected of a crime and his phones were a means of sharing the

---

[8]  It appears that the reference to defendant residing in the apartment for twelve years was based on a police report that was submitted to the judge but not included in the record.

files. His activity in attempting to delete the evidence in the officers' view resulted in exigent circumstances. The officer lawfully preserved the evidence pending further review. The police, thus, legally seized the phones and obtained a valid warrant to search the same phones.

Defendant does not challenge the search warrant or dispute the judge's finding that the seizure of the cell phones was outside the scope of the search warrant. Instead, defendant argues that the judge "wrongly held that the State established exigent circumstances based on a mistaken legal determination of when the seizure of the phones occurred."

"When reviewing a trial court's decision to grant or deny a suppression motion, appellate courts '[ordinarily] defer to the factual findings of the trial court so long as those findings are supported by sufficient evidence in the record.'" State v. Smart, 253 N.J. 156, 164 (2023) (alteration in original) (quoting State v. Dunbar, 229 N.J. 521, 538 (2017)). That said, "[w]e will set aside a trial court's findings of fact only when such findings 'are clearly mistaken.'" Dunbar, 229 N.J. at 538 (quoting State v. Hubbard, 222 N.J. 249, 262 (2015)). "We accord no deference, however, to a trial court's interpretation of law, which we review de novo." Ibid.

Turning to the substantive legal principles, "[a] warrantless search [or seizure] is presumed invalid unless it falls within one of the recognized

exceptions to the warrant requirement." State v. Gamble, 218 N.J. 412, 425 (2014) (quoting State v. Cooke, 163 N.J. 657, 664 (2000)). Because all warrantless searches or seizures are "presumptively unreasonable," State v. Elders, 192 N.J. 224, 246 (2007), "the State bears the burden of demonstrating by a preponderance of the evidence that an exception to the warrant requirement applies," State v. Manning, 240 N.J. 308, 329 (2020).

The exception at issue in this case is exigent circumstances. Exigent circumstances "cannot be precisely defined or reduced to a neat formula." State v. Johnson, 193 N.J. 528, 552 (2008); see also State v. DeLuca, 168 N.J. 626, 632 (2001) ("'[T]he term "exigent circumstances" is, by design, inexact. It is incapable of precise definition because, by its nature, the term takes on form and shape depending on the facts of any given case.'" (quoting Cooke, 163 N.J. at 676)). Consequently, the application of the exigent-circumstances exception demands a "fact-sensitive, objective analysis." DeLuca, 168 N.J. at 632.

> Generally, when the State invokes the exigent-circumstances exception to justify a warrantless search [or seizure], it must prove by a preponderance of the evidence that (1) the search was premised on probable cause and (2) law enforcement acted in an objectively reasonable manner to meet an exigency that did not permit time to secure a warrant.
>
> [Manning, 240 N.J. at 333.]

In <u>Johnson</u>, the Court identified factors to consider when determining whether law enforcement faced exigent circumstances, including "the urgency of the situation, the time it will take to secure a warrant, the seriousness of the crime under investigation, and the threat that evidence will be destroyed or lost or that the physical well-being of people will be endangered unless immediate action is taken." <u>Johnson</u>, 193 N.J. at 552-53; <u>see also</u> <u>DeLuca</u>, 168 N.J. at 632 ("Generally stated, circumstances are exigent when they 'preclude expenditure of the time necessary to obtain a warrant because of a probability that the suspect or the object of the search will disappear, or both.'" (quoting <u>State v. Smith</u>, 129 N.J. Super. 430, 435 (App. Div. 1974))).

Applying these principles, we agree with the judge that the warrantless seizure of defendant's cell phones was permissible under the exigent-circumstances exception. Hallett had ample probable cause to believe defendant was file-sharing child pornography and that his cell phones contained relevant evidence of the crime. Hallett also acted in an objectively reasonable manner to meet an exigency that did not permit time to secure a warrant. Based on the facts asserted in Specht's affidavit, Hallett knew defendant was the "target" of the investigation and resided in the apartment that was the object of the search. Once defendant produced cell phones that would have been subject to seizure

pursuant to the search warrant had defendant been in the apartment when the search team arrived, Hallett reasonably believed the devices contained incriminating evidence and there was a threat the evidence would be destroyed unless immediate action was taken.

Defendant argues the judge believed defendant's "activity in attempting to delete the evidence in the officers' view resulted in exigent circumstances." However, according to defendant, "that alleged exigency could not justify the seizure because it did not occur until after the phones had already been seized." Defendant's argument ignores the fact that Hallett credibly testified he "took possession of [defendant's] cell phones" when defendant first produced them because he was "concerned about the data being wiped" from the phones. Given Hallett's training and experience in cell phone data extraction, he was aware of the ephemeral nature of cell phone data.

Although "[a] 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property," State v. Washington, 475 N.J. Super. 292, 301 (App. Div. 2023) (alterations in original) (quoting State v. Marshall, 123 N.J. 1, 67 (1991)), Hallett merely seized the cell phones to obtain a search warrant to search their contents. Given the nature of

the intrusion and the law enforcement interest at stake, the seizure of the phones was permissible.

"The [F]ourth [A]mendment prohibits not all searches and seizures but only those that are deemed unreasonable" and "not all warrantless seizures are unlawful." Marshall, 123 N.J. at 67-68. "'Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant,'" the Fourth Amendment "'permit[s] seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it . . . .'" Id. at 68 (quoting United States v. Place, 462 U.S. 696, 701 (1983)); see also Riley v. California, 573 U.S. 373, 388 (2014) ("[The defendants] concede that officers could have seized and secured their cell phones to prevent destruction of evidence while seeking a warrant. That is a sensible concession." (citation omitted)); Illinois v. McArthur, 531 U.S. 326, 334 (2001) (finding "no case in which th[e] Court has held unlawful a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time"); United States v. Brown, 701 F.3d 120, 126-27 (4th Cir. 2012) (holding "it was entirely reasonable for the officers to seize [the defendant's] laptop . . . to prevent either it or its contents from being

22

damaged or destroyed" where police had "probable cause to believe that any computer used by [the defendant] . . . harbored evidence of child pornography" (emphasis omitted)). Here, we are satisfied that under the circumstances, the exigencies of the situation justified the warrantless seizure of defendant's phones until a search warrant was secured to search their contents.[9]

## III.

In Point II, defendant argues the judge erred in denying his motion for a judgment of acquittal at the close of the State's case. As to the distribution charge, defendant asserts "[t]he only evidence implicating [him] . . . was that he was the subscriber of the IP address from which the files were downloaded." As to the possession charge, defendant contends "excluding the shared files, the State failed to prove that he possessed at least 1,000 items [of child pornography]," necessary for a second-degree conviction, and instead only proved that defendant "possessed at most 770 items" found on his cell phones.

---

[9] In the alternative, the State raises the inevitable discovery doctrine to avoid exclusion of the evidence. However, because the State raises the issue for the first time on appeal, the factual record is not sufficiently developed for us to address it. See State v. Witt, 223 N.J. 409, 419 (2015) (cautioning against addressing "belatedly raised" issues not properly "preserved for appellate review" particularly when the opposing party "was deprived of the opportunity to establish a record" and the trial court "was never called on to rule" on the issue).

Accordingly, defendant posits his "possession conviction must . . . be amended to a third-degree offense."

At the close of the State's case, defendant moved for judgment of acquittal on both charges pursuant to Rule 3:18-1. After applying the Reyes[10] standard, the judge concluded the State had met its burden and denied the motion. In addressing the evidence pertaining to the distribution charge, the judge stated:

> [T]here has been testimony by the witnesses, in particular, the first witness Detective Specht, which indicated that the IP address that has been identified as belonging to . . . defendant was the IP address that these images were found to be on. With respect to what device, . . . based upon the statute it does not appear as though that has to be proven by the State. Specifically, the statute provides that the State is not required to offer proof that any item depicting the sexual exploitation or abuse of the child had actually been searched, copied, transmitted or viewed by another use[r] of the file sharing program or by any other person. And it's not a defense that he did not intend to distribute the item to any other user.

Turning to the possession charge, the judge explained:

> [W]hile there is . . . an argument . . . from the defense . . . that it should be a third[-]degree, the court also notes that for aggregation purposes each depiction of the exploitation or the abuse of the child is considered a separate item. But the statute does provide that when it comes to video clips they shall be counted as ten separate items.

---

[10] State v. Reyes, 50 N.J. 454, 458-59 (1967).

A-1860-21

So again, the reasonable inference that can be drawn based upon the testimony of Detective Hallett, as well as the other witnesses that testified relative to what was found when they searched the IP address, certainly the jury can infer and find that there were more than enough images for a second[-]degree as opposed to a third[-]degree.

"Motions for a judgment of acquittal are governed by Rule 3:18-1," State v. Tindell, 417 N.J. Super. 530, 548 (App. Div. 2011), which provides in part:

At the close of the State's case . . . , the court shall, on defendant's motion or its own initiative, order the entry of a judgment of acquittal of one or more offenses charged in the indictment . . . if the evidence is insufficient to warrant a conviction.

[R. 3:18-1.]

However,

a trial court must deny the defendant's motion if "'viewing the State's evidence in its entirety . . . and giving the State the benefit of all its favorable testimony as well as all of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt . . . beyond a reasonable doubt.'"

[State v. Ellis, 424 N.J. Super. 267, 273 (App. Div. 2012) (alterations in original) (quoting State v. Wilder, 193 N.J. 398, 406 (2008)).]

See also Reyes, 50 N.J. at 458-59 (articulating the seminal standard of review for acquittal motions).

"On appeal, we utilize the same standard as the trial court in determining whether a judgment of acquittal was warranted." Ellis, 424 N.J. Super. at 273. However, "we apply a de novo standard of review," State v. Williams, 218 N.J. 576, 594 (2014), and "owe no deference to the findings of . . . the trial court," State v. Lodzinski, 249 N.J. 116, 145 (2021).

Guided by these principles, we consider the proofs necessary to establish the offenses at issue in this case. Defendant was charged with violating N.J.S.A. 2C:24-4(b)(5)(a)(iii), which provides:

> (a) A person commits a crime if, by any means, including but not limited to the [i]nternet, he[or she]:
>
> . . . .
>
> (iii) knowingly stores or maintains an item depicting the sexual exploitation or abuse of a child using a file-sharing program which is designated as available for searching by or copying to one or more computers.

"A violation of [N.J.S.A. 2C:24-4(b)(5)(a)] that involves 1,000 or more items depicting the sexual exploitation or abuse of a child is a crime of the first degree . . . ." N.J.S.A. 2C:24-4(b)(5)(a). The statute clarifies that

> [f]or aggregation purposes, . . . each depiction that is in the form of a photograph, picture, image, or visual depiction . . . shall be considered to be one item and each depiction that is in the form of a film, video,

26

video-clip, movie, or visual depiction . . . shall be considered to be [ten] separate items . . . .

[N.J.S.A. 2C:24-4(b)(7).]

N.J.S.A. 2C:24-4(b)(5)(a) also expressly states that:

the State shall not be required to offer proof that an item depicting the sexual exploitation or abuse of a child had actually been searched, copied, transmitted or viewed by another user of the file-sharing program, or by any other person, and it shall be no defense that the defendant did not intend to distribute the item to another user of the file-sharing program or to any other person. Nor shall the State be required to prove that the defendant was aware that the item depicting the sexual exploitation or abuse of a child was available for searching or copying to one or more other computers, and the defendant shall be strictly liable for failing to designate the item as not available for searching or copying by one or more other computers.

In addition, defendant was charged with violating N.J.S.A. 2C:24-4(b)(5)(b)(ii), which provides: "[a] person commits a crime of the second degree if he knowingly possesses, knowingly views, or knowingly has under his control, through any means, including the [i]nternet, at least 1,000 but less than 100,000 items depicting the sexual exploitation or abuse of a child."

The State presented sufficient evidence from which a jury could find defendant guilty of the distribution charge. Hiles testified that between March 2018 and March 2019, his law-enforcement modified BitTorrent software

27

connected to an IP address on no less than thirteen occasions and performed single-source downloads of files containing child pornography. Specht testified that the suspect IP address was registered in defendant's name and to defendant's address during the entirety of the investigation, which she corroborated with a public records search. Specht also testified that defendant's wireless network was password protected. Further, Yeats testified that defendant's apartment revealed only one place to sleep, allowing the inference that defendant was the sole occupant. In addition, Hallett testified that defendant had file-sharing software downloaded on his two phones, that he had conducted torrent-searches on the phones, and that data extractions from the phones revealed items consistent with child pornography.

Critically, the files Hiles downloaded from defendant's IP address on July 16, 2018, alone established that defendant file-shared more than 1,000 items of child pornography, sufficient for a first-degree EWC offense. Hiles testified that on July 16, 2018, he downloaded two folders from defendant's IP address, each containing 104 videos. The jury viewed each video in one folder, and Hiles testified that he viewed each video in the other folder. Hiles confirmed that each video was "pornographic" and involved "all minor females." Because each

28

video counts as ten items, combined, the folders contained a total of 2,080 items of child pornography.

To support his argument that there was insufficient evidence to withstand a Rule 3:18-1 motion, defendant highlights the State's failure to present direct evidence that "the person who shared th[e] files was [defendant] and not someone else." Specifically, defendant points out that "the State itself produced evidence that another person had access to the Margate address and could have shared the files" and the State did not "identify the device or devices used to share the files." However, the statute does not require the State to identify the specific device. See N.J.S.A. 2C:24-4(b)(5)(a). Moreover, the State presented circumstantial evidence that defendant resided alone at the Margate address associated with an IP address registered to him and maintained a password-protected wireless network.

"No distinction is made between direct and circumstantial evidence." Tindell, 417 N.J. Super. at 549. Indeed, "'[w]hen each of the interconnected inferences [necessary to support a finding of guilt beyond a reasonable doubt] is reasonable on the evidence as a whole, judgment of acquittal is not warranted.'" State v. Jones, 242 N.J. 156, 168 (2020) (second alteration in original) (quoting State v. Samuels, 189 N.J. 236, 246 (2007)).

Turning to the possession charge, the jury could reasonably infer that defendant viewed the thousands of child pornography images contained in the files Hiles downloaded between March 2018 and March 2019. N.J.S.A. 2C:24-4(b)(5)(a) defines the term "possess" to include "receiving, viewing, or having under one's control, through any means, including the [i]nternet." In addition, Hallett testified that defendant's ZTE cell phone contained seven playable videos, which is the equivalent of seventy items. Hallett testified further that defendant's Coolpad cell phone contained at least 700 images of child pornography.[11] Hallett also recounted that defendant conducted internet searches on both cell phones that contained search terms consistent with child pornography. In the web history of defendant's Coolpad cell phone, Hallett found nine "search terms" that contained "PTHC" and "120 files associated with that term."

In sum, considering "the totality of evidence, be it direct or circumstantial, in a light most favorable to the State," and giving the State "the benefit of all its . . . favorable inferences [that] reasonably could be drawn therefrom," Jones,

---

[11] Defendant argues that the 700 items found on the Coolpad cell phone should be reduced because "a lot of them were duplicates." However, the statute does not differentiate between individual and duplicate images. See N.J.S.A. 2C:24-4(b)(7) ("[E]ach depiction of the sexual exploitation or abuse of a child shall be considered a separate item . . . .").

A-1860-21

242 N.J. at 168 (alteration in original) (emphasis omitted) (quoting State v. Perez, 177 N.J. 540, 549 (2003)), there was sufficient evidence presented for a jury to find defendant guilty of both charges.

IV.

In Point III, defendant argues he was denied a fair trial due to the prosecutor's "inflammatory comments" and "appeal to [defendant's] criminal propensity." Specifically, defendant asserts that the prosecutor: (1) "repeatedly and unnecessarily emphasized the graphic nature of the child pornography images and videos," and (2) impermissibly connected defendant to the distribution charge by arguing that "[m]ost people don't have child pornography on their phone."

"[P]rosecutors in criminal cases are expected to make vigorous and forceful closing arguments to juries . . . ." State v. McNeil-Thomas, 238 N.J. 256, 275 (2019) (quoting State v. Frost, 158 N.J. 76, 82 (1999)). As such, prosecutors are "'afforded considerable leeway in closing arguments'" so long as their comments "'stay[] within the evidence and the legitimate inferences [drawn] therefrom.'" Ibid. (first quoting Frost, 158 N.J. at 82; and then quoting State v. R.B., 183 N.J. 308, 330 (2005)). On the other hand, making "'[r]eferences to matters extraneous to the evidence' may constitute prosecutorial

31

misconduct," State v. Williams, 244 N.J. 592, 607 (2021) (quoting State v. Jackson, 211 N.J. 394, 408 (2012)), as would "making inaccurate [legal or] factual assertions to the jury," State v. Garcia, 245 N.J. 412, 435 (2021); State v. Smith, 167 N.J. 158, 178 (2001). Prosecutors should also "refrain from unfairly inflaming the jury." State v. Atwater, 400 N.J. Super. 319, 335 (App. Div. 2008).

Nonetheless,

> even when a prosecutor's remarks stray over the line of permissible commentary, our inquiry does not end. Rather, we weigh "the severity of the misconduct and its prejudicial effect on the defendant's right to a fair trial," and we reverse a conviction on the basis of prosecutorial misconduct only if "the conduct was so egregious as to deprive [the] defendant of a fair trial."
>
> [McNeil-Thomas, 238 N.J. at 275 (quoting State v. Wakefield, 190 N.J. 397, 437 (2007)).]

Stated differently, we will not reverse a conviction based on prosecutorial misconduct during the State's summation unless it "substantially prejudice[d] the defendant's fundamental right to have the jury fairly evaluate the merits of his[ or her] defense." Garcia, 245 N.J. at 436 (quoting State v. Bucanis, 26 N.J. 45, 56 (1958)). The same principles apply to a prosecutor's opening statement. See State v. Rivera, 437 N.J. Super. 434, 452 (App. Div. 2014) (noting that "[e]gregious misconduct" by a prosecutor in an opening statement may

32

"'substantially prejudice[] the defendant's fundamental right to have a jury fairly evaluate the merits of' his defense" and may "raise a reasonable doubt about the conviction[]." (second alteration in original) (quoting State v. Harris, 181 N.J. 391, 495 (2004))).

In reviewing a claim of prosecutorial misconduct, "an appellate court must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred." Williams, 244 N.J. at 608 (quoting Frost, 158 N.J. at 83). "Factors to be considered in making that decision include, '(1) whether defense counsel made timely and proper objections to the improper remarks; (2) whether the remarks were withdrawn promptly; and (3) whether the court ordered the remarks stricken from the record and instructed the jury to disregard them.'" Ibid. (quoting Frost, 158 N.J. at 83). Additionally, "[i]n reviewing closing arguments, we look, not to isolated remarks, but to the summation as a whole," Atwater, 400 N.J. Super. at 335, mindful that "[a] prosecutor may respond to an issue or argument raised by defense counsel" and such a response "cannot be considered a foray beyond the evidence adduced at trial." State v. Johnson, 287 N.J. Super. 247, 266 (App. Div. 1996).

Here, defendant takes issue with the following comment made by the prosecutor during summation:

> So the defense says that . . . I'm asking you to guess that [defendant] was the one distributing this. But I'm not asking you to guess. It was him. It was on his phone. All these downloads were coming from his apartment. There's no indication that anybody else was living there. There was a gentleman by the name of Frank Cruz who was there when the police arrived and knocked on the door that morning. But look at the pictures, they'll be back in evidence. Where would somebody else be living in there? It's [defendant's] apartment. It's his residence. There's not even a bed for someone to sleep in.
>
> And . . . defendant wants you to kind of be confused about MAC addresses[12] and they could have figured out exactly what device it was coming from, that it's the wrong BitTorrent software on his phone. But he has the same search terms on his phone as some of the images that were found. That LS Magazine, every single one of those 104 videos said LS models on them. Maybe LS models and LS Magazine is different; I don't know. It sounds the same to me.
>
> Most people don't have child pornography on their phone so I disagree respectfully when counsel says that I am asking you to jump. It's not really a jump. [Defendant's] phones were full of child pornography. The phones he had on him . . . . when the police came into contact with him. The downloads were coming

---

[12]  Specht had testified that a MAC address is "assigned by [the] manufacturer" and "can uniquely identify each particular device," unlike an IP address which "tell[s] you the network that the information is being shared on" and "the account that's accessing the network."

A-1860-21

> from . . . his apartment. There's nobody else living there. Again ladies and gentlemen, it's not a jump.

Defendant did not object to the comment at trial. "'Generally, if no objection was made to the improper remarks,' they 'will not be deemed prejudicial.'" State v. Kane, 449 N.J. Super. 119, 141 (App. Div. 2017) (quoting Frost, 158 N.J. at 83). "The failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made" and "deprives the court of an opportunity to take curative action." Frost, 158 N.J. at 84. Nevertheless, having reviewed the statements, we find no error, much less plain error, warranting a new trial. See R. 2:10-2 (providing "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result").

The prosecutor's comments were confined to the evidence adduced at the trial and the reasonable inferences drawn therefrom. The comments were also responsive to defendant's attacks on the State's proofs. In summations, defense counsel highlighted that law enforcement never ruled out Cruz as the individual using defendant's IP address, "only identified the IP address and not the device in question," and never found "the BitTorrent client Deluge," which "was the client that was sharing the[] images with Agent Hiles," on either of defendant's phones.

In fact, it was defense counsel who first stated in his summations:

> The prosecutor is going to stand up here and he's going to say none of that matters. We want you to guess he did it. <u>He had child porn on his phone.</u> Guess it was him sharing it. Ignore the fact that it could have been one of his friends. Ignore that. Ignore that it could have been somebody else over there. Guess that he did it. Guess that he was guilty of that.
>
> [(Emphasis added).]

Critically, the remarks were also a proper comment on evidence presented at the trial that was intrinsic to both offenses. <u>See</u> <u>State v. Rose</u>, 206 N.J. 141, 180 (2011) (holding that evidence is considered intrinsic if it "'directly proves' the charged offense" or if the acts in question are "performed contemporaneously with the charged crime" and "facilitate the commission of the charged crime." (quoting <u>United States v. Green</u>, 617 F.3d 233, 248-49 (3d Cir. 2010))). To directly prove that defendant was guilty of the distribution charge and to distinguish defendant from other potential suspects, like Cruz, the prosecutor pointed out that child pornography discovered on defendant's cell phones was consistent with the files shared through defendant's IP address. In addition, other than Deluge, both phones contained BitTorrent software clients, supporting the State's theory that defendant was using the file-sharing program. These were legitimate inferences properly drawn from the evidence presented.

We therefore reject defendant's contention that the prosecutor's comment improperly relied "on a highly prejudicial propensity inference" to prove the distribution charge.

Defendant also argues that the prosecutor went "beyond the bounds of fair comment" by "repeatedly emphasizing the graphic nature of the child pornography evidence."  In support, defendant delineates the following litany of comments made by the prosecutor during opening and closing arguments:  "[t]he bad news is . . . I have the misfortune of having to show you the images"; "unfortunately you will see [images of child pornography]"; "I tried to keep my promise about having to show you guys the images and the videos but to do it in the most efficient manner possible to spare yourselves and myself and everyone here in the courtroom from having to look at it"; and "I'm sure you can't forget and probably unfortunately won't forget for a long time that on three of those dates we scrolled through a large amount of images."

Once again, because defendant failed to object at trial, we review for plain error.  See R. 2:10-2.  We acknowledge that prosecutors "cannot resort to improper appeal[s] to the jury's emotions," State v. Darrian, 255 N.J. Super. 435, 454 (App. Div. 1992) (citing State v. Williams, 113 N.J. 451, 453 (1988)), or "play on the passions of the jury," State v. Blakney, 189 N.J. 88, 96 (2006).

However, although the prosecutor's descriptions in the case may have been graphic, they were not unjustified by the evidence presented.  See State v. Johnson, 31 N.J. 489, 511-12 (1960) (holding that prosecutor's summation describing the defendants "as killers, robbers, strong-arm men, and gunmen," as well as "'triggerman,' 'ring leader,' 'conniving fingerman,' and the like" "may have been graphic" but "was not unjustified by the evidence").

Indeed, given the graphic nature of the evidence, even defense counsel stated in his opening statement:

> The moment that the very first image hits that big screen over there, . . . all of you are going to be angry.  You're gonna be disgusted.  As bad as you think it is, it's probably going to be worse.  There's no getting around it.  You might be angry at the prosecutor for having to show you those images.  You might be angry with me for defending [defendant].  You might be angry with [defendant] for being charged with these offenses.  But these are offenses that he is presumed innocent of.

In summation, defense counsel again commented:

> I told you when I first spoke with you that images that you were going to see were going to be disturbing images.  And I can tell from the looks on your faces from looking around the room nobody was thrilled to have to look at any of those images.

Notably, in her final instructions, the judge properly reminded the jurors that they must decide the case based "solely upon [their] understanding and

38

recollection of the evidence that was admitted during the trial" and that "[a]rguments, statements, opening remarks and closing remarks [were] not evidence and must not be treated as evidence."  The judge also instructed the jurors that they were "to weigh the evidence calmly and without passion, prejudice or sympathy."  "[T]he jury is presumed to follow the trial court's instructions."  State v. Burns, 192 N.J. 312, 335 (2007); see Darrian, 255 N.J. Super. at 454 ("[T]he trial judge . . . instructed the jurors that what the attorneys said in their openings was not evidence and that they were to decide the case without bias, prejudice or sympathy.  There can be no assumption that the jury did not faithfully follow this admonition.").

In sum, none of the remarks complained of on appeal were deemed so prejudicial that they prompted an objection from defense counsel at trial, and "none of the remarks [were] 'so egregious that it deprived defendant of a fair trial.'"  Darrian, 255 N.J. Super. at 458 (quoting State v. Ramseur, 106 N.J. 123, 322 (1987)).

## V.

In Point IV, defendant argues that the judge erred in failing to sua sponte "instruct the jury on third-party guilt despite evidence clearly indicating that

Frank Cruz could have distributed the files."  Defendant asserts the omission "effectively reduced the State's burden."

Ordinarily, a "[d]efendant is required to challenge instructions at the time of trial."  State v. Morais, 359 N.J. Super. 123, 134-35 (App. Div. 2003) (citing R. 1:7-2); see also State v. Adams, 194 N.J. 186, 206-07 (2008) ("[A] defendant waives the right to contest an instruction on appeal if he does not object to the instructions as required by Rule 1:7-2.").  When a defendant fails to object to the instructions, "it may be presumed that the instructions were adequate." Morais, 359 N.J. Super. at, 134-35.  "The absence of an objection to a charge is also indicative that trial counsel perceived no prejudice would result."  Id. at 135.

In the absence of an objection, we review the charge for plain error and reverse only if the error was "clearly capable of producing an unjust result." State v. McKinney, 223 N.J. 475, 494 (2015) (quoting R. 2:10-2).

> Plain error in the context of a jury charge is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."
>
> [State v. Torres, 183 N.J. 554, 564 (2005) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)).]

"Nevertheless, because clear and correct jury instructions are fundamental to a fair trial, erroneous instructions in a criminal case are 'poor candidates for rehabilitation under the plain error theory.'" Adams, 194 N.J. at 207 (quoting Jordan, 147 N.J. at 422). As such, "[t]he error must be considered in light of the entire charge and must be evaluated in light 'of the overall strength of the State's case.'" State v. Walker, 203 N.J. 73, 90 (2010) (quoting State v. Chapland, 187 N.J. 275, 289 (2006)).

In the absence of a request for a specific charge or an objection to its omission, we apply the "clearly indicated" standard, "requiring the unrequested charge to be 'clearly indicated' from the record." State v. Alexander, 233 N.J. 132, 143 (2018). That means "if counsel does not request the instruction, it is only when the evidence clearly indicates the appropriateness of such a charge that the court should give it." Walker, 203 N.J. at 87. The "clearly indicated" standard does not require trial courts to "meticulously sift through the entire record . . . to see if some combination of facts and inferences might rationally" support the charge. State v. Funderburg, 225 N.J. 66, 81 (2016) (quoting State v. Choice, 98 N.J. 295, 299 (1985)). Instead, the evidence supporting the charge must "jump[ ] off the page" to trigger a trial court's duty to sua sponte give the instruction. State v. Denofa, 187 N.J. 24, 42 (2006).

Here, considering the entire charge and the strength of the State's case, the judge's omission of a third-party guilt jury instruction in the absence of a request or objection by defendant does not rise to the level of plain error. The need for the unrequested charge did not "jump[] off the page," ibid., just because someone else was present at defendant's apartment when the search warrant was executed. The file-sharing of child pornography from an IP address registered to defendant's physical address, where he maintained a password-protected wireless network, had been ongoing for at least one year and there was no evidence that Cruz had been present on any of the download dates. In addition, the evidence showed that there was only one feasible place to sleep in the apartment. Further, the discovery of evidence consistent with child pornography on defendant's cell phones also tied defendant, rather than any other person, to the crimes. Thus, the trial evidence in its entirety did not clearly indicate the charge was needed.

Although a defendant may attempt "to prove his innocence by showing that someone else committed the crime," State v. Koedatich, 112 N.J. 225, 297 (1988), the evidence must be more than conjecture or speculation. It cannot be simply a "possible ground of suspicion against another person." Id. at 305 (quoting State v. Denny, 357 N.W.2d 12, 17 (Wis. Ct. App. 1984)). A third-

42

party guilt charge essentially reinforces the more general jury instructions that the State always maintains the burden to prove beyond a reasonable doubt that the defendant committed the crime, and the defendant has no obligation to prove anything or present any evidence.[13]

---

[13] The third-party guilt model jury charge reads as follows:

> The defendant contends that there is evidence before you indicating that someone other than he or she may have committed the crime or crimes, and that evidence raises a reasonable doubt with respect to the defendant's guilt.
>
> In this regard, I charge you that a defendant in a criminal case has the right to rely on any evidence produced at trial that has a rational tendency to raise a reasonable doubt with respect to his/her own guilt.
>
> I have previously charged you with regard to the State's burden of proof, which never shifts to the defendant. The defendant does not have to produce evidence that proves the guilt of another, but may rely on evidence that creates a reasonable doubt. In other words, there is no requirement that this evidence proves or even raises a strong probability that someone other than the defendant committed the crime. You must decide whether the State has proven the defendant's guilt beyond a reasonable doubt, not whether the other person or persons may have committed the crime(s).
>
> [Model Jury Charges (Criminal), "Third-Party Guilt" (approved Mar. 9, 2015) (footnotes omitted).]

A-1860-21

Because the judge provided the general jury instructions and defense counsel vigorously cross-examined the State's witnesses regarding Cruz's presence in defendant's apartment and the State's failure to identify the device used to file-share the illicit files, the jury was sufficiently informed of defendant's contention that a third person was guilty of the offenses. Therefore, the omission of the charge did not prejudicially affect defendant's substantial rights. See Marshall, 123 N.J. at 145 (noting "the prejudicial effect of an omitted instruction must be evaluated 'in light of the totality of the circumstances— including all the instructions to the jury, [and] the arguments of counsel . . . .'" (alteration in original) (quoting Kentucky v. Whorton, 441 U.S. 786, 789 (1979))).

## VI.

In Point V, defendant argues that "[e]ven if . . . the above errors do not individually warrant reversal, their cumulative effect . . . denied [him] a fair trial." When multiple errors are alleged, "the predicate for relief for cumulative error must be that the probable effect of the cumulative error was to render the underlying trial unfair." Wakefield, 190 N.J. at 538. However, even when a defendant alleges multiple errors, "the theory of cumulative error will still not apply where no error was prejudicial and the trial was fair." State v. Weaver,

44                                                                    A-1860-21

219 N.J. 131, 155 (2014). Here, because we are convinced there was no reversible error and the trial was fair, defendant's cumulative error argument fails. See ibid. ("A defendant is entitled to a fair trial but not a perfect one." (internal quotation marks omitted) (quoting Wakefield, 190 N.J. at 537)).

## VII.

Finally, in Point VI, defendant argues the judge imposed an excessive sentence by: (1) failing to find "mitigating factor four based on [defendant's] significant mental health issues and traumatic childhood"; (2) "enhancing [defendant's] sentence based on unproven conduct for which he was not convicted"; and (3) "considering the severity of the present offense in finding and attributing substantial weight to aggravating factor six." (Emphasis omitted). Defendant also contends that a remand is necessary because "the sentencing court failed to assess [defendant's] ability to pay before imposing a [SCVTF] penalty" and to amend the JOC "to reflect that [defendant] was convicted of N.J.S.A. 2C:24-4(b)(5)(a)(iii)." As to the remand, the State concedes that "[a] remand would be appropriate limited to the judge providing a statement of reasons for the SCVTF penalties assessed, and to amend[] the [JOC] so it accurately reflects defendant's [distribution] conviction."

Our sentencing standard of review is well established.  We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute [our] judgment for those of our sentencing courts,'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)).  Thus, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Here, after reviewing the presentence report and the Avenel report, see N.J.S.A. 2C:47-1, which indicated that defendant's conduct was characterized by a pattern of "repetitive and compulsive sexual behavior," the judge sentenced defendant to fifteen years' imprisonment, with a mandatory ten-year period of parole ineligibility pursuant to N.J.S.A. 2C:24-4(b)(5)(a), on the distribution charge, and a concurrent seven-year term on the possession charge.  Based on the "high" risk of re-offense, "[t]he extent of . . . defendant's prior criminal record and the seriousness of the offenses of which he ha[d] been convicted," and "the clear need" for deterrence, the judge found aggravating factors three,

six, and nine.  See N.J.S.A. 2C:44-1(a)(3), (6), (9).  On the other hand, the judge

found no mitigating factors and concluded that "the aggravating factors clearly

and substantially outweighed the non-existing mitigating factors."

In support, the judge began her analysis by recounting defendant's juvenile

and adult criminal history:

> Defendant was previously convicted of sale of obscene material to a person less than eighteen years old under [N.J.S.A. 2C:34-3(b)(1)] on August 3, 2010.
>
> A review of his adult criminal history . . . does reveal the twenty-three known arrests or complaints including the present matter, with seven known prior convictions, three indictable, four municipal since 2000.
>
> The prior convictions, including the one I just mentioned, there was also criminal trespass, unlawful possession of a weapon, defiant trespasser two times, attempt to cause purposely or knowingly bodily injury to another, resisting arrest.
>
> He has also violated numerous local ordinances. He has three noted probation violations and last maxed out of prison on June 3, 2006.  He was afforded the opportunity of a six-month conditional discharge as well back in 2006.  The instant matter, therefore, represents his fourth indictable conviction.
>
> He does have three cases of domestic violence filed against him.  Two of those three cases were dismissed, leaving one [f]inal [r]estraining [o]rder listed against him.

He does also have a juvenile court history as well.

Next, in making specific findings, as to aggravating factor three, the judge stated:

> The court . . . finds by clear and convincing evidence based upon all the information in the adult presentence report that aggravating factor three applies . . . . There is a high risk that . . . defendant will commit another offense, owing to the course of his conduct leading to the instant conviction he has shown a[] pattern of behavior that can be used to predict his future conduct. Aggravating factor three is given substantial weight.

As to aggravating factor six, the judge explained:

> Aggravating factor six also applies and is also given substantial weight. The extent of . . . defendant's prior criminal record and the seriousness of the offenses of which he has been convicted. . . . [D]efendant has had numerous contacts with the criminal and juvenile justice system. The offense that he stands here convicted of today is, in fact, serious.

Regarding aggravating factor nine, the judge expounded:

> Aggravating factor nine applies . . . . This factor is also given great weight. There is a clear need to deter this defendant and others from violating the law. In this case it is, again, particularly weighty. . . . [D]efendant's behavior went unabated for a period of time until he was arrested. This conduct requires deterrence and only a lengthy commitment will assure that he will be deterred in the future.

48

We are satisfied that the judge's qualitative assessment of defendant's background supported findings aggravating factors three, six, and nine because it showed a strong risk of re-offense and underscored the need to deter him from future criminal activity. Defendant argues the judge "abused [her] discretion by enhancing [his] sentence based on unproven conduct for which he was not convicted." According to defendant, the judge "gave substantial weight to aggravating factor six" after considering defendant's prior "arrests" and "dismissed charges" as well as defendant's "contacts" with the criminal justice system. Defendant further asserts that "[f]or the same reason, the [judge] should have given minimal weight to . . . aggravating factors [three and nine]."

On the contrary, we discern no abuse of discretion in the judge's reference to defendant's arrests as part of defendant's personal history, even though the charges stemming from those arrests were later dismissed. Indeed, "[t]he defendant's background, including prior arrests or juvenile offenses, should be fully exposed, even though no convictions have ensued" as long as a dismissed charge "is not given the weight of a criminal conviction." State v. Marzolf, 79 N.J. 167, 177 (1979). We have also recognized that "[a]dult arrests that do not result in convictions may be 'relevant to the character of the sentence . . . imposed.'" State v. Rice, 425 N.J. Super. 375, 382 (App. Div.

49

2012) (second alteration in original) (quoting State v. Tanksley, 245 N.J. Super. 390, 397 (App. Div. 1991)).  Clearly, here, the judge did not consider defendant's dismissed charges as convictions.

Equally unpersuasive is defendant's argument that the judge erred in finding that there was a risk defendant would reoffend based on his history of domestic violence.  We have previously affirmed a sentencing court's finding that a defendant posed a risk of reoffending based upon the defendant's "propensities to engage in acts of domestic violence."  State v. DeRoxtro, 327 N.J. Super. 212, 226 (App. Div. 2000).  Thus, the judge was well within her discretion in considering defendant's history of domestic violence.

Defendant also argues that the judge abused her direction "by considering the severity of the present offense" in applying aggravating factor six.  Defendant asserts the judge should not have "consider[ed] the present offense under aggravating factor six" because "[t]hat factor by its terms is limited to prior convictions."  We acknowledge that aggravating factor six requires the sentencing court to consider "[t]he extent of the defendant's prior criminal record and the seriousness of the offenses of which the defendant has been convicted."  N.J.S.A. 2C:44-1(a)(6) (emphasis added).  Although the judge commented on the severity of the present offenses, the comment was not the sole justification

50

for the judge's application of aggravating factor six. Because there was ample support in the record for the judge finding aggravating factor six, we view the comment as harmless.

Further, defendant contends the judge should have applied mitigating factor four, N.J.S.A. 2C:44-1(b)(4), which defense counsel requested. N.J.S.A. 2C:44-1(b)(4) provides "[t]here were substantial grounds tending to excuse or justify the defendant's conduct, though failing to establish a defense." Defendant maintains the record contains "overwhelming evidence in support of [mitigating] factor [four]," including defendant's troubled upbringing in foster care; his biological mother's alcoholism; his lack of a father figure; his diagnoses of "schizo-affective disorder, bipolar disorder, and post-traumatic stress disorder"; his substance abuse history; and his military service.

"Mitigating factors that 'are called to the court's attention' should not be ignored," Case, 220 N.J. at 64 (quoting State v. Blackmon, 202 N.J. 283, 297 (2010)), "and when 'amply based in the record . . . , they must be found,'" ibid. (quoting State v. Dalziel, 182 N.J. 494, 504 (2005)). A sentencing court must "explain clearly why [a] . . . mitigating factor presented by the parties was found or rejected and how the factors were balanced to arrive at the sentence." Id. at 66 (citing Fuentes, 217 N.J. at 73).

51

In rejecting defendant's contention that mitigating factor four applied, the judge "disagree[d] that there [were] any substantial grounds to excuse and/or justify . . . defendant's conduct even in light of . . . defendant's prior history and the information provided with respect to his upbringing and potential mental health issues." The judge properly considered the application of mitigating factor four as part of the deliberative process but ultimately determined it did not apply. Because the judge articulated her reasons, we see no basis to second-guess her decision. Even if mitigating factor four had been applied, it would not have affected the sentence which was at the mid-point of the range for a first-degree conviction because the aggravating factors still preponderated. See State v. Kiriakakis, 235 N.J. 420, 436 (2018) ("'[W]hen the aggravating factors preponderate, sentences will tend toward the higher end of the range.'" (quoting State v. Natale, 184 N.J. 458, 488 (2005))).

In sum, the judge set forth reasons for defendant's sentence with sufficient clarity and particularity and made findings that are amply supported by competent and credible evidence in the record. Defendant's sentence was in accord with the sentencing guidelines, was based on a proper weighing of the factors, and does not shock the judicial conscience.

52

Defendant argues, and the State concedes, that the judge erred in assessing the maximum SCVTF penalties applicable under N.J.S.A. 2C:14-10 without providing a statement of reasons or considering defendant's ability to pay.

Under N.J.S.A. 2C:14-10, "a person convicted of a [qualifying] sex offense . . . shall be assessed a penalty . . . not to exceed" $2,000 for a first-degree crime, N.J.S.A. 2C:14-10(a)(1), and $1,000 for a second-degree crime, N.J.S.A. 2C:14-10(a)(2). In State v. Bolvito, 217 N.J. 221 (2014), our Supreme Court held that:

> [T]he SCVTF penalty is mandatory in cases in which a defendant is convicted of a sexual offense identified in the statute. We further hold that a sentencing court may impose an SCVTF penalty against a defendant in any amount between a nominal figure and the upper limit prescribed by N.J.S.A. 2C:14-10(a) for the degree of the offense at issue. In setting an SCVTF penalty, the sentencing court should consider the nature of the offense, as well as the defendant's ability to pay the penalty during any custodial sentence imposed and after his or her release. We further hold that the sentencing court should provide a statement of reasons as to the amount of any penalty imposed pursuant to N.J.S.A. 2C:14-10(a).
>
> [Id. at 224.]

In this case, defendant was convicted of two qualifying sex offenses that required the imposition of SCVTF penalties. However, the judge imposed the maximum SCVTF penalty for each offense without considering defendant's

ability to pay or providing a statement of reasons. Therefore, we vacate the penalties and remand to the trial court for the limited purpose of reconsidering the SCVTF penalties in accordance with Bolvito.

Lastly, defendant asserts, and the State concedes, that a limited remand is necessary to correct the JOC to accurately reflect defendant's distribution charge. Currently, the JOC inaccurately states that defendant was convicted of N.J.S.A. 2C:24-4(b)(5)(a)(i), instead of N.J.S.A. 2C:24-4(b)(5)(a)(iii). Therefore, a remand to the trial court for the correction of the JOC is warranted.

Affirmed as to defendant's convictions and sentence, with the exception of the SCVTF penalties and the JOC, which we remand to the trial court for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1860-21